IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| CANDICE ANDERSON, RHONDA ERICKSON, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF GENE MIKALE ERICKSON, DECEASED, INDIVIDUALLY, AND VANIA ROSE VAUGHN AS NEXT FRIEND FOR SIARA ROSE ERICKSON AND SAVANA RAINES ERICKSON, MINORS, *Plaintiffs,* <br><br> v. <br><br> GENERAL MOTORS, LLC *Defendant.* | § § § § § § § § § § § § § § § § | Civil Action No. 6:14-cv-538 <br><br> JURY |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW PLAINTIFFS, CANDICE ANDERSON, RHONDA ERICKSON, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF GENE MIKALE ERICKSON, DECEASED, AND VANIA ROSE VAUGHN AS NEXT FRIEND FOR SIARA ROSE ERICKSON AND SAVANA RAINES ERICKSON, MINORS (the "PLAINTIFFS") bring this action against DEFENDANT, GENERAL MOTORS, LLC ("GM".

### I. Introduction and Summary of Complaint

1.     Candice Anderson and Gene Mikale Erickson were severely injured in a single vehicle crash of a 2004 Saturn Ion on November 15, 2004.  Gene Mikale Erickson died shortly thereafter.   The Plaintiffs named herein originally brought suit in this Court against DEFENDANT GENERAL MOTORS, LLC ("GM"), in their individual capacities and as Representative of the Estate of Gene Mikale Erickson for personal injury, wrongful death, strict product liability, negligence, and fraudulent concealment claim.   The Plaintiffs executed a

Settlement Agreement with GM in April 2008, which was ultimately sealed by this Court at GM's request during the minors settlement conference (hereinafter "Settlement Agreement.") Approximately six years after the Settlement Agreement was executed, the Plaintiffs became aware, for the first time, that the 2004 Saturn Ion contained defective parts and was subject to a massive nationwide recall—information that GM knew prior to executing the Settlement Agreement, but that it intentionally and fraudulently withheld from both this Court and the Plaintiffs.

2.      GM is one of the largest car and truck manufacturers in the United States. It designed and manufactured the 2004 Saturn Ion that is at issue in this case, along with over a million other similar cars. All of these cars contained the same safety-related defects.  GM knew about the safety-related defects in the 2004 Saturn Ion, and did nothing to recall or fully remedy the defects or warn users about them. Rather, GM intentionally, purposely, fraudulently, and systematically concealed the defects from the Plaintiffs, the National Highway Traffic Safety Administration ("NHTSA"), and the driving public.   Indeed, Saturn, the car dealership that sold/serviced Plaintiffs' car right before the accident, "knew of the problems that Plaintiffs were having with the Saturn Ion. It undertook to repair her car, repaired the wrong parts, overlooked a critical GM Technical Safety Bulletin, performed unnecessary and conducted ineffective repairs, failed to test drive it, and without repairing her car returned it to Anderson.

3.      However, the Plaintiffs knew nothing about these defects—of which GM was aware for years—and the Plaintiffs ultimately settled their case based on the information they had at the time, which did not include information regarding the recall or the defective ignition switches in certain make and model GM vehicles, including the subject 2004 Saturn Ion.

4.     GM's fraudulent concealment of pertinent evidence from the Plaintiffs, as well as GM's engineers' repeated perjury (as detailed below), resulted in the Plaintiffs being misled about the key facts of their underlying case.  The Plaintiffs' previous Settlement Agreement was therefore based on incomplete and false information that GM deliberately withheld solely to fraudulently induce the Plaintiffs to settle their case.

5.     Candice Anderson was ultimately charged with criminal negligent homicide because there was no clear explanation at the time of the accident as to why her vehicle veered off the road.   GM allowed Candice Anderson to believe that she was solely responsible for causing the death of her fiancé, Gene Mikale Erickson, when GM had knowledge that would exculpate her.  However, instead of producing the exculpatory evidence, GM hid the information, sat back and watched Candice Anderson plead guilty to a crime she was not responsible for because GM knew that the guilty plea would hamper Plaintiffs' ability to make a full recovery against GM.

6.     In 2014, shortly after Plaintiffs became aware of GM's fraudulent and deceptive behavior, the Plaintiffs tendered an offer of rescission to GM through its lawyer Darrel Barger of Hartline, Dacus, Barger Dreyer & Kern, LLP.  GM was given until May 27, 2014 to accept or deny the tender and rescission.  To date, GM has not responded.

7.     GM's misconduct, fraudulent concealment, fraud against the Court and systematic concealment of the safety-related defects, tolls any statute of limitations that might otherwise be applicable to this action.

8.     The fraud and fraud on the Court claims asserted herein are extrinsic to the consolidated matters previously before this Court styled Civil Action No. 6:07cv12 *Candice*

*Anderson vs. General Motors Corporation, et al* and Civil Action No. 6:07cv13 *Rhonda Erickson, et al vs. General Motors Corporation, et al.*

9.      In the prior actions, GM perpetrated a scheme by which the integrity of the judicial process has been fraudulently subverted by a deliberately planned scheme in a manner involving far more than an injury to a single litigant.  There is no other available or adequate remedy and the relief sought by Plaintiffs is not due to their own fault, neglect or carelessness.

## II. Parties, Jurisdiction, and Venue

10.      Plaintiff Candice Anderson is a citizen of Texas and resides in Mabank, Henderson County, Texas.

11.      Plaintiff RHONDA ERICKSON, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF GENE MIKALE ERICKSON, DECEASED, is a citizen of Canton, Van Zandt County, Texas. She is the lawfully appointed Representative of the Estate of Gene Mikale Erickson.

12.      VANIA ROSE VAUGHN AS NEXT FRIEND FOR SIARA ROSE ERICKSON AND SAVANA RAINES ERICKSON, MINORS is a citizen of Benton, Bossier Parrish, Louisiana.

13.      Defendant GENERAL MOTORS, LLC, is a Delaware limited liability company. With respect to the facts alleged and claims asserted in this Petition, GM is the corporate successors of General Motors Corporation, which filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009.  July 10, 2009, GENERAL MOTORS, LLC., acquired substantially all of the assets and assumed certain liabilities of General Motors Corporation by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code.  Plaintiffs' causes of action in this lawsuit are brought again GENERAL MOTORS, LLC, and Plaintiffs do

not asset any causes of action against General Motors Corporation.   Although this Petition references facts against General Motors Corporation, it is for background and reference purposes only.  At all times relevant to the claims in this lawsuit, GENERAL MOTORS, LLC, has been in the business of developing, manufacturing, and marketing cars throughout the State of Pennsylvania.   GENERAL MOTORS, LLC., has a network of authorized retailers that sells GENERAL MOTORS, LLC, vehicles and part throughout Texas.  GENERAL MOTORS, LLC., may be served with process through its registered agent for service of process in the State of Texas, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

14.     GM is subject to the jurisdiction of and venue in this Court.

15.     There is complete diversity of citizenship under 28 U.S.C. § 1332(a) as this suit involves a controversy between citizens of different states or between a citizen of a state and an alien.  The amount in controversy exceeds $75,000 exclusive of interest and costs.

### III. Factual Background

**A.     The Purchase of the 2004 Saturn Ion**

16.     In 2004 Plaintiff Anderson purchased the 2004 Saturn Ion from SATURN OF TYLER in Smith County, Texas.

**B.     The Wreck – Anderson's Injury and Erickson's Injury and Death**

17.     Plaintiffs' original lawsuit was brought to recover damages for personal injuries arising out of a catastrophic head on collision in involving the subject 2004 Saturn ION automobile that occurred on or about November 15, 2004 in Van Zandt County, Texas. On that date, the Saturn Ion automobile was being driven by Plaintiff Anderson on Van Zandt County Road number 4106 when she lost control of the Saturn and crashed into a tree causing extensive front end damage to said vehicle. The frontal air bags failed to deploy, even though the

crash itself was more than sufficient in magnitude to activate the air bag restraint system and cause deployment of said air bags. Plaintiff was severely injured and her fiancé, Gene Mikale Erickson, was killed. Both Anderson and Erickson were thrown violently against the dash and front windshield.

18.     Because of the nature of the crash, the known (to GM) safety-related defects in the 2004 Saturn Ion caused the key in Plaintiff's car to turn from the run to accessory/off position as she was driving on CR 4106. Once the key turned, the engine shut off. The safety-related defects in the Ion shut off her power steering, and greatly reduced her braking power and steering function. As a result of the engine shutting off, Plaintiff lost control of the Saturn Ion, veered off the roadway and struck a tree.  Evidence also shows that frontal airbags do not deploy when the key is in the accessory/off position.

19.     Anderson was 21 years old at the time. Erickson was 25 years old at the time. Both suffered catastrophic injuries as a result of the 2004 Saturn Ion safety-related defects, with Erickson's injuries being so severe that the injuries resulted in his death.

## C.   GM's Knowledge of Safety-Related Defects In The Saturn Ion and Its Concealment of Those Defects

20.     It has now come to light that the Saturn Ion has safety related design defects that were known by GM as early as 2001.  First, a low torque detent in the ignition switch allows the key to be inadvertently turned from the run to accessory/off position. Second, because of the low position of the key lock module on the steering column, a driver can inadvertently bump the key fob or chain which results in the key turning from am to the accessory/off position. Third, the key sold with the Ion has a slot design which allows the key fob or chain to hang lower on the key and increases the chance of the key inadvertently moving from the run to accessory/off

position during ordinary driving maneuvers. The design of the ignition switch, position of the key lock module, and slot design of the key are hereinafter referred to as the "Key System."

21.     In 2001, during developmental testing of the 2003 Saturn Ion, GM learned that the engines in those cars were stalling due to defects in the Key System. GM chose not to fix the defects.

22.     In 2002, GM began manufacturing and selling 2003 Saturn Ions with the defective Key System. It later began selling Chevrolet Cobalts with the same defective Key System.

23.     In 2004, GM engineers reported that the ignition switch on the Saturn Ion was so weak and so low on the steering column that a driver's knee could easily bump the key and turn off the car.

24.     This defect was sufficiently serious for a GM engineer, in January 2004, as part of GM's vehicle evaluation program, to affirmatively conclude, in writing, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

25.     In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt. The Cobalt was a sister vehicle (essentially the same car with a different badge or name) of the Saturn Ion. As noted, GM installed the same Key System on the 2005 Cobalt as it did on the Saturn Ion.

26.     On October 29, 2004, around the time of GM's market launch of the 2005 Cobalt, Gary Altman — GM's program-engineering manager for the Cobalt — test-drove the Cobalt with the standard key and key fob. During the test drive, when Altman's knee bumped the key, the engine turned off, causing the engine to stall. Altman reported this incident to GM.

27.     In response to Altman's report, GM launched an engineering inquiry to investigate the potential for the key to move from the "run" to the "accessory/off" position during ordinary driving conditions. This inquiry is known within GM as a Problem Resolution Tracking System Inquiry ("PRTS"). The specific complaint which resulted in the PRTS was that the "the vehicle can be keyed off with knee while driving."

28.     On February 1, 2005, as part of the PRTS, GM engineers concluded:

> There are two main reasons that [sic] we believe can cause a lower effort in turning the key: 1. A low torque detent in the ignition switch. 2. A low position of the lock module in the column. (PRTS — Complete Report N172404).

29.     As part of the PRTS, GM engineers also began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during ordinary driving.

30.     On February 18, 2005, GM engineers presented several possible solutions to the Cockpit Program Integration Team ("CPIT"). GM engineers determined the only "sure solution" to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver.

31.     According to GM engineers, this change in the key position on the lock module, combined with increasing the detent in the ignition switch, would be a "sure solution." GM, however, through Altman, rejected this "sure solution," in part, because the cost to implement the solution would be too high.

32.     During this PRTS, GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem.

33.     Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain. With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was contacted or moved in any way. GM engineers determined this key change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

34.     A GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle or around 57 cents per part.

35.     GM, however, rejected this proposed key change and, on March 9, 2005, GM closed the PRTS without taking any steps to fix the defective Key System in Ions and Cobalts. The PRTS detailed the reasons why GM took no action.

> Per GMX001 PEM's [Gary Altrnan] directive we are closing this PRTS with no action. The main reasons are as following: All possible solutions were presented to CPIT and VAPTR: a. The lead-time for all the solutions is too long. b. The tooling cost and piece price are too high. c. None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during driving. Thus **none of the solutions represents an acceptable business case.** (emphasis added)

36.     On February 28, 2005, GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

37.     The February 28, 2005, bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.

38.    In the February 28, 2005, bulletin, GM provided the following recommendations/instructions to its dealers — **but not to Plaintiffs, this Court or to the public in general:**

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

39.    At that time, however, GM knew that the inadvertent turning off of the ignition in the vehicles was due to design defects in the Key System in those vehicles, including the Saturn Ion, and **was not** limited to short drivers using large heavy key chains.

40.    GM failed to disclose and, in fact, concealed, the February 28, 2005 bulletin — and/or the information contained therein, from Saturn Ion and Chevrolet Cobalt owners, including the Plaintiffs in their underlying suit, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a "sure solution" to the problem, and GM's knowledge of it.

41.    Indeed, rather than disclosing this serious safety problem that uniformly affected all Saturn Ion cars, GM, instead, concealed and obscured the problems, electing to wait until

customers brought their cars to a dealership after an engine-stalling incident, and offered even its own dealers only an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

42.     As of February 2005, GM engineers knew that the Saturn Ion and Chevrolet Cobalt vehicles had the Key System safety-related defects discussed in this Complaint.

43.     Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."

44.     Instead of complying with its legal obligations, however, GM fraudulently concealed the Key System defect from the public — including Plaintiff and this Court— and continued to manufacture and sell Ions and Cobalts with these known safety defects, causing Plaintiff to continue to own a vehicle that contained a defective and dangerous Key System and hiding the defect during the original pending litigation of Plaintiffs' claims.

45.     In March 2005, following its receipt of a customer complaint that his/her Cobalt vehicle ignition turned off while driving, GM opened another PRTS — Complete Report (0793/2005-US). Steve Oakley, the brand quality manager for the Cobalt, originated the PRTS. As part of the PRTS, Mr. Oakley reviewed an email dated March 9, 2005 from Jack Weber, a GM engineer. The subject of the email was "Cobalt SS Ignition Turn Off." In the email Mr. Weber stated:

> I've had a chance to drive a Cobalt SS and attempt to turn off the ignition during heel/toe down shifting. Much to my surprise, the first time I turned off the ignition switch was during a normal traffic brake application on I96. After that I was able to do a static reproduction of the condition in a parking lot. I've attached photos of the condition with comments. My Anthropometric
> Measurements are attached below:
>
> Static view of keys, fob and registration hitting knee.

Position of RKE fob during normal driving. Dynamic evaluation.

View of steering column cover and Pass Key 3+"lump" under the key slot.

Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position. Static evaluation.

Fob has levered around the steering column cover and turned the ignition off.

Unobstructed view of the fob and column cover.

Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.

Please call at (586) 986-0622 with questions.

Jack Weber

Mr. Weber clearly identified the defects in the Key System while he was driving the Cobalt, which is essentially the same vehicle as the Saturn Ion.

46.     Despite the clear evidence of the safety-related defect with the Key System, during the March 2005 PRTS, GM engineers decided not to reconsider any of the proposed solutions discussed during the February 2005 PRTS. Instead, the GM engineers leading the PRTS recommended that sole corrective action GM should recommend would be to advise customers to remove excess material from their key rings, even though GM knew that the inadvertent turning off of the ignition in these vehicles was due to design defects in the Key System in those vehicles, and was not limited to drivers having excess key ring materials.

47.     In May 2005, GM, following its receipt of another customer complaint that his/her Cobalt vehicle ignition turned off while driving, it opened another PRTS.

48.     During the May 2005 PRTS, GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving.

49.     Despite this initial safety/redesign commitment, however, GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public, including the Plaintiffs, to the defective vehicles' serious safety risks.

50.     At or about this same time, GM, through Alan Adler, GM's Manager, Product Safety Communications, issued the following statement with respect to the Chevrolet Cobalt's 'inadvertent shut-off problems, affirmatively representing in its "Statement on Chevrolet Cobalt Inadvertent Shut-offs" that:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running
>
> When this happens, the Cobalt is still controllable. The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by

inadvertently bumping the ignition from the run to accessory or off position.

GM's statement, however, was demonstrably false and misleading.

51.     Contrary to GM's above-referenced statement, GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. GM knew that these incidents were not caused by heavy key chains or a driver's size and seating position. GM knew that removing the non-essential material from key rings would not "virtually eliminate" the possibility of inadvertent bumping of the ignition key from the "run" to the "accessory/off" position while the car is running

52.     GM's above-referenced statement was further demonstrably false and misleading because GM knew that these incidents were ultimately caused by the safety-related defects in the Key System identified in the February 2005 PRTS.

53.     But GM's affirmative concealment of the problems with the defective vehicles, including the Saturn Ion and Cobalt cars, did not end there.

54.     On July 29 2005, Amber Marie Rose, a sixteen-year-old Clinton, Maryland resident, was driving a 2005 Cobalt when she drove off the road and struck a tree head-on. Amber's driver's side frontal airbag did not deploy and she died as a result of the injuries she sustained in the crash.

55.     GM received notice of Amber's incident in September 2005 and opened an internal investigation file pertaining to this incident shortly thereafter.

56.     During its investigation of the incident, GM learned that the key in Amber's Cobalt was in the "accessory/off" position at the time of the crash.

57.     During its investigation of the incident in which Amber was killed in her Cobalt vehicle, GM also knew that the driver's side frontal airbag should have deployed given the circumstances of the crash. Upon information and belief, GM subsequently entered into a confidential settlement agreement with Amber's mother.

58.     In December 2005, shortly after it commenced its internal investigation into the incident leading to Amber's death, GM issued a Technical Service Bulletin (05-02-35-007) (the "TSB").

59.     The TSB, which GM affirmatively represented applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet 1-11-1Rs, 2005-2006 Pontiac Pursuit, 2006 Pontiac Solstices, and **2003-2006 Saturn Ions**, provided, "Information on inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs," provided the following service information:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design. As a result, the key ring cannot move up and down in the slot any longer - it can only rotate on the hole. In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design. This will result in the keys not hanging as low as in the past.

60.     As with its prior statement regarding the defective vehicles (see above), the information GM provided in this TSB was also false and misleading.

61.     In the two PRTSs GM issued before it issued the TSB, GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening.

62.     Indeed, at the time it issued the TSB, GM knew that these incidents were happening to drivers of all sizes using keys with the standard key-fobs.   Yet, this information was never disclosed during the original pending litigation involving Plaintiffs' in 2006-2008.

63.     In other words, GM knew these incidents were not caused by short drivers with heavy key chains, but were caused by the safety-related defects in the Key System of its defective vehicles, including the Chevrolet Cobalt cars.

64.     In 2005, GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents. GM never told the public, including Plaintiff, that it was buying back Cobalts under these circumstances. GM refused to buy back Cobalts from other customers who had also experienced engine-stalling incidents. In fact, for many of the customers who complained about experiencing engine-stalling incidents, GM never informed these customers of the TSB and/or the availability of the key insert.

65.     On November 17, 2005, shortly after Amber's death and immediately before GM's issuance of the TSB, there was **another** incident involving a 2005 Cobalt in Baldwin, Louisiana. In that incident, the Cobalt went off the road and hit a tree. The frontal airbags did not deploy in this accident. GM received notice of this accident, opened a file, and referred to it as the "Colbert" incident.

66.     On February 10, 2006, in Lanexa, Virginia, shortly after GM issued the TSB, a 2005 Cobalt drove off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

67.     On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

68.     On August 1, 2006, following its receipt of a customer complaint about a Cobalt stalling while driving, GM opened yet another PRTS relating to this issue. GM closed this PRTS on October 2, 2006 however, without taking any action.

69.     In October 2006, GM updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HEIR, 2007 Cobalt and 2007 Pontiac Solstice and 05. These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB.   All of the vehicles identified in the original TSB and updated TSB are hereinafter referred to as the "Defective Vehicles."

70.     On December 29 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree. The frontal airbags failed to deploy in this incident. GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.

71.     On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off"

position. GM received notice of this incident, opened a file, and referred to it as the "White" incident.

72.     On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck. The frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.

73.     On September 25, 2007, in New Orleans, Louisiana, a 2007 Chevrolet Cobalt lost control and struck a guardrail. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.

74.     On October 16 2007, in Lyndhurst, Ohio, a 2005 Chevrolet Cobalt traveled off road and hit a tree. The frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.

75.     On April 5, 2008, in Sommerville, Tennessee, a 2006 Chevrolet Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

**D.     GM Investigates Further, But Continues to Conceal The Defect**

76.     On May 21, 2008, in Argyle, Wisconsin, a 2007 Pontiac G5 traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.

77.     On May 28, 2008, in Lufkin, Texas, a 2007 Chevrolet Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.

78.     On September 13, 2008, in Lincoln Township, Michigan, a 2006 Chevrolet Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.

79.     In 2008, in Rolling Hills Estates, California, a 2008 Chevrolet Cobalt traveled off the road and hit a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.

80.     On December 6, 2008, in Lake Placid, Florida, a 2007 Chevrolet Cobalt traveled off the road and hit a utility pole. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.

81.     In February 2009, GM opened yet another PRTS with respect to the Defective Vehicles — this time to investigate why the slot in the key in Cobalts allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles.

82.     Through this PRTS, GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent turning off of the ignition switch.

83.     In March 2009, GM approved of the design change in the key from the slot to a hole. According to GM, this redesigned change was implemented in model year 2010 Chevrolet Cobalts. GM, however, chose not to provide these redesigned keys the owners or lessees of any of the vehicles implicated in the TSB,-including the 2005 Cobalt

84.     This timeline gives a short overview of some key points between 2004 and the present, as discussed above:

| | **2005-2009**<br>GM learns of<br>hundreds of field<br>report of Key<br>System failures<br>and multiple<br>fatalities. | **2010-2014** | |
|---|---|---|---|
| **2001-2004**<br>GM learns<br>Key Systems<br>are defective. | | GM learns of more<br>field reports of<br>Key System<br>failures and<br>additional fatalities. | |
| **2005**<br>GM engineers'<br>Proposed fix<br>rejected; Amber<br>Rose dies after<br>airbag in Cobalt<br>fails to deploy | **2009**<br>GM declares and<br>emerges from<br>bankruptcy | **2014**<br>GM issues inadequate<br>recall over 10 years<br>after learning its<br>Key Systems are<br>defective | |

85.     Throughout this entire time period, GM was selling the Defective Vehicles to consumers for full price, and consumers were purchasing them believing that the vehicles were non-defective, but all the while GM was concealing the extent and nature of the defects in the Defective Vehicles.  Most importantly, and relevant to the instant suit, throughout this time GM settled lawsuits with various plaintiffs for injuries and deaths resulting from motor vehicle accidents in GM vehicles that GM knew to be defective without revealing the full extent of the defect and GM's knowledge of the defect to the plaintiffs or the various courts.

**E.     Old GM's Marketing Represented to the Public
        that the Defective Vehicles Were Safe**

86.    In a section called "safety," Old GM's Chevrolet website stated:

**OUR COMMITMENT**

Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe — from the start of your journey to your destination. That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

87.    Similarly, old GM promoted its Saturn vehicle line on television with statements like "Putting people first," and "Saturn. People First."

88.    Saturn's print ad campaign featured advertisements like the following, which stated, among other things, "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars."

89.    In sum, in order to increase sales, old GM touted the safety of its vehicles.

90.    But, when the time came for the company to stay true to its words, GM did not disclose its knowledge about the dangerous Key System defects to its customers, including Plaintiffs, and induced Plaintiffs into settling the underlying lawsuit based upon GM's fraud and deception.

**F.    Meet the New GM, Same as the Old GM**

91.    In 2009, GM declared bankruptcy and, weeks later, it emerged from bankruptcy. Both before and after GM's bankruptcy, the Key Systems in the Defective Vehicles continued to fail and GM, in all iterations, continued to conceal the truth.

92.    On May 15, 2009, GM again met with Continental AG, an airbag component supplier, and requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.

93.    On December 31, 2010, in Rutherford County Tennessee, a 2006 Chevrolet Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

94.    On December 31, 2010, in Harlingen, Texas, a 2006 Chevrolet Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

95.    On March 22, 2011 Ryan Jahr, a GM engineer, downloaded the SDM from a Cobalt. The information from the SDM download showed that the key in that Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash.

96.    On December 18, 2011, in Parksville, South Carolina, a 2007 Chevrolet Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

97.    These incidents are not limited to vehicles of model year 2007 and before. According to GM's own investigation, there have been over 250 crashes involving 2008-2010 GM vehicles in which the airbags failed to deploy.

98.     In 2010, GM began a formal investigation of the frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s. GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

99.     In August 2011, GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

100.    In Spring 2012, Stouffer asked Jim Federico, a high-level executive and chief engineer at GM, to oversee the FPE investigation. Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

101.    In May 2012, GM engineers tested the torque on the ignition switches for 2005-2009 Cobalts, 2007 and 2009 Pontiac 05s, 2006-2009 HHRs, and 2003-2007 Saturn Ion vehicles in a junkyard. The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet GM's minimum torque specification requirements. These results were reported to Stouffer and other members of the FPE.

102.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving GM vehicles. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective Key System. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

103.    During the field-performance-evaluation process, GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would

inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

104.    Indeed, the GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. GM rejected each of these ideas.

105.    GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position. GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. GM engineers also believed that the additional changes to the Key System (such as the shroud) were necessary to fix the defects with the Key System.

106.    The GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but GM concealed — and continued to conceal — from the public, the nature and extent of the defects.

107.    By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Saturn Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles. They also knew that when this happened the airbags would no longer work in frontal crashes.

108.    Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple

fatalities. Despite this knowledge, GM chose to conceal this information from the public, NHTSA, and Plaintiffs.

109.    In December 2012, in Pensacola, Florida, Ebram Handy, a GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch. At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition-switch for the 2005 Cobalt.

110.    At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below GM's minimum torque performance specifications. Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

111.    In January 2013, Handy, in preparation for a Rule 30(b)(6) deposition, spoke with several GM engineers, including DeGiorgio and Stouffer. At that time, Handy knew that, based on the testing he had observed, the original ignition switch in the 2005 Cobalt failed to meet GM's minimum torque performance specifications. GM knew that an ignition switch that did not meet its minimum torque performance requirements was a safety-related defect.

## G.   GM Fraudulently Conceals Evidence From The Plaintiffs to Induce Them to Settle the Underlying Suit

112.    In November 2006, Plaintiffs filed the underlying suit asserting a products liability cause of action against GM for design, manufacturing, and marketing defects relating to the 2004 Saturn Ion.

113.   On November 30, 2006, the law firm of Hartline, Dacus, Barger, Dreyer & Kern, LLP filed an Answer on behalf of General Motors asserting affirmative defenses that the 2004 Saturn Ion driven by Plaintiff complied with all Federal Motor Vehicle Safety Standards and all other applicable federal requirements, despite GM having knowledge to the contrary for at least 5 years before the pleading was filed.

114.   On March 27, 2007, GM provided its Rule 26(a) Initial Disclosures GM said it would search and produce documents relevant to the claims or defenses of any party.  However, GM never produced any documents relating to the ignition switch and airbag system in the Saturn Ion, or any other Defective Vehicles that were substantially similar to the 2004 Saturn Ion.

115.   The Plaintiffs relied on the Rule 26(a) Disclosures, as well as the representations of GM and its attorneys, that no one from GM knew about any defect in the design of the subject vehicle relating to the ignition switch / airbag systems in 2004 Saturn Ion's or substantially similar GM vehicles.  However, GM clearly possessed knowledge of the defect both before the accident and after the accident while litigation was pending.

116.   Candice Anderson was ultimately charged with criminal negligent homicide because there was no clear explanation at the time of the accident as to why her vehicle veered off the road.  GM allowed Candice Anderson to believe that she was solely responsible for causing the death of her fiancé, Gene Mikale Erickson, when GM had knowledge that would exculpate her.  However, instead of producing the exculpatory evidence, GM hid the information, sat back and watched Candice Anderson plead guilty to a crime she was not responsible for because GM knew that the guilty plea would hamper Plaintiffs' ability to make a full recovery against GM.

117.    The Defendant then sent correspondence to Plaintiffs' counsel pushing for a quick settlement.

118.    The Plaintiffs subsequently settled their claims against GM for a total of $75,000 in April 2008 without the benefit of all of the information and relying upon GM's deception and fraudulent non-disclosure.

119.    Hartline, Dacus, Barger represented GM then, and continues to represent GM today on matters related to the GM recall.   The Law Firm's knowledge of GM's defective ignition switch at time of settlement will be relevant in determining GM's knowledge and intent to withhold information from its own attorneys, consumers, litigants, and public at large.

**H.    GM Perpetrated Fraud On The Court**

120.    The settlement also included two minor children, Siara Rose Erickson and Savana Raines Erickson.   The minor settlement required Court approval with the assistance of a Court appointed guardian ad litem, John Rex Thompson.   It is incredulous to believe that the guardian ad litem would have recommended to the Court the then offered settlement amounts for the minor children of the deceased had the guardian ad litem and the family been provided all relevant and necessary information as to the then known product defects clearly possessed and known by GM at that time.   Furthermore, Plaintiffs anticipate the Court would not have accepted and/or approved of the small settlement amount offered by GM to the minor plaintiffs for the death of their father had GM properly and disclosed to the Court the known defects relating to the 2004 Saturn Ion and other substantially similar vehicles before the settlement conference as required by Rule 26(a).

**I.    GM Recall Comes 10 Years After Plaintiffs' Accident Despite Admissions of Defect In 2006 Which Were Never Disclosed To Plaintiffs.**

121.    On February 7, 2014, GM, in a letter from Carmen Benavides, Director Product Investigations and Safety Regulations for GM, notified NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac 05 vehicles.

122.    In its February 7, 2014, letter to NHTSA, GM represented that as replacement ignition switches became available, GM would replace the ignition switches on the Defective Vehicles.

123.    On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to NHTSA. The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

124.    The February 19, 2014 request for timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety-related defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

125.    On February 24, 2014, GM in a letter from Carmen Benavides, informed NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet I-EHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

126.    GM included an Attachment to the February 24, 2014 letter. In the Attachment GM, **for the first time,** admitted that GM authorized a change in the ignition switch in 2006, 2 years before GM fraudulently coerced Plaintiffs to settle their claims. Specifically, GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition

switch to GM at some point during the 2007 model year. (GM's February 24, 2014 letter and Attachment are attached as Exhibit A.)

127.    GM then produced documents in response to Congressional requests leading up to the hearings April 1 and 2, 2014. Among the documents produced by GM is a document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26, 2006. According to this document, Delphi had met all of the sign-off requirements in order to provide a new ignition switch for certain GM vehicles. GM has acknowledged that the ignition switch in the Cobalt was included in this design change.

128.    The design change included a new detent plunger "to increase torque force in the switch." Mr. DeGiorgio's signature is on this page as the GM authorized engineer who signed off on this change to the ignition switch.

129.    This GM Commodity Validation Sign-Off shows that Mr. DeGiorgio repeatedly perjured himself during his deposition on April 29, 2013. Mr. DeGiorgio perjured himself in order to fraudulently conceal evidence from the Plaintiffs that GM had signed off on the change in the ignition switch so that the Plaintiffs, and ultimately a jury, would never know that GM was changing the switches in 2007 and later model year Cobalts and concealing these changes.

130.    Mr. DeGiorgio perjured himself when he signed the errata sheet confirming that all the testimony was true and accurate.

131.    In November 2006, the Plaintiffs filed their original lawsuit against GM. In April 2008, the Plaintiffs agreed to settle their claims against GM and executed a settlement agreement.  The Plaintiffs settled the settled their case based on the information they had at the time, which did not include the information that GM was aware of the product defect in the 2004

Saturn Ion or other substantially similar GM vehicles before the accident and certainly before the Plaintiffs were fraudulently induced into settling their claim against GM in 2008.

132.    GM's fraudulent concealment of the evidence from the Plaintiffs, resulted in the Plaintiffs being misled about the true facts of the case. Thus, their settlement was based on incomplete and false data that GM had withheld solely to induce them to settle their case.

133.    Plaintiffs learned that GM fraudulently concealed relevant evidence and affirmatively misled them, and that their settlement was based on incomplete and false data, and that GM had withheld that data solely to induce them to settle their case.

134.    After reviewing the information now available because of the GM recall, the Plaintiffs realized the full scope of GM's deception. On or about May 11, 2014, the Plaintiffs tendered an offer of rescission to GM through its lawyer Darrel Barger of Hartline, Dacus, Barger Dreyer & Kern, LLP. The Plaintiffs gave GM until May 27, 2014 to accept or deny the tender and rescission. GM and its attorneys have not responded.

## IV. Claims Against GM

**Count One: Fraud, Constructive Fraud, Fraudulent Concealment and Fraud in the Inducement.**

135.    All preceding statements and allegations of Plaintiffs' Complaint are incorporated herein and realleged as if expressly set forth herein.

136.    From the beginning and during the continuance of the parties' course of dealings, the Defendant made numerous false and material misrepresentations to Plaintiffs and others with the intent that these misrepresentations be relied upon by Plaintiffs. As used herein, the term "misrepresentations" includes, but is not limited to, omissions whereby the Defendant failed to

disclose relevant and material facts to Plaintiffs so as to deprive Plaintiffs of a full, complete, fair and accurate picture of the facts and circumstances relating to the parties' interactions and the Settlement Agreement.

137.    These misrepresentations made to Plaintiffs by the Defendant include, but are not limited to, the following:  (a) On November 30, 2006, the law firm of Hartline, Dacus, Barger, Dreyer & Kern, LLP filed an Answer on behalf of General Motors asserting affirmative defenses that the 2004 Saturn Ion driven by Plaintiff complied with all Federal Motor Vehicle Safety Standards and all other applicable federal requirements, despite GM having knowledge to the contrary for at least 5 years before the pleading was filed;  and (b) On March 27, 2007, GM provided its Rule 26(a) Initial Disclosures GM said it would search and produce documents relevant to the claims or defenses of any party.  However, GM never produced any documents relating to the ignition switch and airbag system in the Saturn Ion, or any other Defective Vehicles that were substantially similar to the 2004 Saturn Ion.

138.    Additionally, GM intentionally concealed material facts from the Plaintiffs.  GM knew that the 2004 Saturn Ion and other GM vehicles were designed and manufactured with Key System defects, but GM concealed those material facts during the course of the underlying litigation.  GM had a duty to disclose the facts to the Plaintiffs and this Court, but failed to do so. GM knew that neither the Plaintiffs nor the Court had knowledge of those facts and that they did not have an equal opportunity to discover the facts. GM was in a position of superiority with respect to its knowledge of the defective condition of the subject vehicle.

139.    By failing to disclose these material facts, GM intended to induce Plaintiffs into settling the underlying lawsuit in order to prevent the knowledge of the defective vehicles from

reaching the Plaintiffs, Court and the public at large and to reduce its eventual financial exposure.

140.   Plaintiffs reasonably relied on GM's fraud and nondisclosure when they entered into the Settlement Agreement.

141.   The settlement also included two minor children, Siara Rose Erickson and Savana Raines Erickson.  The minor settlement required Court approval with the assistance of a Court appointed guardian ad litem, John Rex Thompson.  It is believed that the guardian ad litem would not have recommended to the Court the offered settlement amounts for the minor children of the deceased had the guardian ad litem been provided all relevant and necessary information as to the known existence of the known product defects clearly possessed and known by GM at the time.

142.   Plaintiffs anticipate the Court would not have accepted and/or approved of the small settlement offered by GM to the minor plaintiffs for the death of their father had GM properly disclosed to the Court the known defects relating to the 2004 Saturn Ion and other substantially similar vehicles before the settlement conference as required by Rule 26(a).

143.   These misrepresentations were made by the Defendant to induce Plaintiffs to enter into the Settlement Agreement and to induce Plaintiffs to refrain from taking actions to protect and enforce their legal rights.  Plaintiffs relied upon these material misrepresentations by the Defendant and hereby sue the Defendant for actual fraud, constructive fraud, and fraud in the inducement.

144.   As a result of these acts, misrepresentations, and omissions of the Defendant, Plaintiffs have suffered substantial damages, including but not limited to reliance damages, the loss of the benefit of its bargain with the Defendant, and other costs associated with the

Defendant's behavior.  Plaintiffs seek these damages from the Defendant together with punitive damages, pre-judgment and post-judgment interest, attorneys' fees, and all other relief under applicable law.

**Count Two: Conspiracy**

145.   The Defendant entered into a conspiracy to suppress and fraudulently misrepresent material information that they were under a duty to disclose to Plaintiffs.   In undertaking such conspiracy, the Defendant purposely failed to properly inform consumers, including Plaintiffs, of the defective nature of certain make, model and year GM vehicles, including the subject vehicle.   The Defendant engaged in the unlawful, overt acts described above, which included the intent and failure to disclose material facts to Plaintiffs.

146.   The Defendant conspired together to commit the tort of fraud and misrepresentation upon Plaintiffs, in the same manner as described herein, knowing that same would induce Plaintiffs to enter into the Settlement Agreement and refrain from taking actions to protect and enforce their legal rights.

147.   The Defendant herein participated in combination in the conspiracy to defraud, conceal, and misrepresent material facts.   This conspiracy had an unlawful, oppressive, and immoral purpose (to decrease risk and financial loss to GM and incidentally increase GM profits by increasing likelihood of settlement) and/or achieved its purpose by unlawful, oppressive, and immoral means (the suppression and fraudulent misrepresentation of material facts regarding important safety and product information of which the Defendant had a duty to disclose and disseminate) and did commit overt acts in furtherance of the conspiracy, which was a legal cause of actual injury and damage to Plaintiffs.

148.     As a result of the conspiracy, the Defendant made fraudulent misrepresentations to Plaintiffs and others as set forth above, and important safety and injury information was concealed form and misrepresented to Plaintiffs, and others upon whom Plaintiffs relied, with the intent that Plaintiffs would rely upon the misrepresentations and absence of concealed information.

149.     As a result of the conspiracy, Plaintiffs relied upon the misrepresentations of fact as specifically stated above, and did rely upon the absence of important safety and injury information.   And, as a result, Plaintiffs were injured and suffered the injuries and damages complained of herein.

## V. Damages

150.     Plaintiffs are entitled to recover actual damages including but not limited to: benefit-of-the bargain damages and damages for personal injury.

151.     The Defendant's actions have been in bad faith and have caused Anderson and the Ericksons to suffer unnecessary trouble and expense. Anderson and the Ericksons are, therefore, entitled to recover from the Defendant all expenses of litigation, including attorneys' fees, costs and expenses.

## VI. Exemplary Damages

152.     All preceding statements and allegations of Plaintiffs' Complaint are incorporated herein and realleged as if expressly set forth herein.

153.     Because the harm done to Plaintiffs resulted from the Defendant's fraud and/or malice, Plaintiffs seek punitive and exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

## VII. Jury Demand

154.    Plaintiffs request a trial by jury.

## Prayer For Relief

WHEREFORE, Plaintiffs request that the Defendant be cited to appear and answer and that upon final judgment, this Court set aside the prior judgment complained of, that Plaintiffs have judgment for their damages and attorneys' fees, and for all other relief to which they are entitled.

**Respectfully Submitted,**

**HILLIARD MUÑOZ GONZALES LLP**

By: _/s/ Robert C. Hilliard_
       Robert C. Hilliard
       State Bar No. 09677700
       Federal ID No. 5912
       bobh@hmglawfirm.com
       Rudy Gonzales, Jr.
       State Bar No. 08121700
       Federal ID No. 1896
       rudyg@hmglawfirm.com
       Catherine D. Tobin
       State Bar No. 24013642
       Federal ID No. 25316
       catherine@hmglawfirm.com
       Marion Reilly
       Texas Bar No. 24079195
       Federal ID No. 1357491
       marion@hmglawfirm.com

       719 S. Shoreline Boulevard,
       Suite 500
       Corpus Christi, TX  78401
       Telephone No.:  (361) 882-1612
       Facsimile No.:   (361) 882-3015

-and-


By: /s/ Thomas J. Henry

Thomas J. Henry
State Bar No. 09484210
Federal ID No. 12980
tjh@tjhlaw.com
Curtis W. Fitzgerald, II
State Bar No. 24012626
Federal ID No. 24980
cfitzgerald@tjhlaw.com

**THOMAS J. HENRY INJURY ATTORNEY**
521 Starr St.
Corpus Christi, Texas 78401
Telephone No.:  (361) 985-0600
Facsimile No.:  (361) 985-0601

**ATTORNEYS FOR PLAINTIFFS**